IN THE MATTER OF THE APPLICATION OF THE ATTORNEY–GENERAL *v.* THE NORTH AMERICA LIFE INSURANCE COMPANY.

*Receiver of an insolvent life insurance company — commissions — upon what funds they are allowed — duty of, as to investment — when he will be charged with interest — the court may review the action of the Superintendent of the Insurance Department in fixing his commissions.*

At the time of the appointment of the receiver of a life insurance company, there were outstanding premium notes and loans upon the policies amounting to $398,028.30. They were considered as offsets to the amounts of the face values of the policies, and were carried on the books of the company, and afterwards on those of the receiver, only as charges or liens on the policies. None of them were collected, but the amount due upon each policy was ascertained by deducting the loans or premium notes standing against it, and the difference was treated as the debt due from the company on which dividends were computed by the receiver.

*Held,* that the receiver was not entitled to commissions upon the amount of such notes and loans.

The receiver advanced moneys to be used in paying off taxes upon lands covered by mortgages belonging to a special fund in the hands of the insurance superintendent, which mortgages were then in process of foreclosure. The moneys were subsequently repaid to him upon the sale of the property.

*Held,* that he was not entitled to receive commissions on the amount so repaid to him.

The superintendent of the insurance department has power to allow commissions to the receiver upon the special fund held by him for the company, and paid over to the receiver, as well as upon the general assets. And such special fund is also chargeable with its proportionate part of the expense of closing up the affairs of the company.

The court has power to review the action of the superintendent of the insurance department in fixing the commissions to be allowed to a receiver.

The commissions of the receiver should not be fixed by the superintendent until he knows the labor to be performed by the receiver, the time necessarily to be occupied by him, and the responsibility to be imposed upon him.

All parties interested in the fund are entitled to notice of the application to fix the commissions of the receiver.

Although it is, under some circumstances, the duty of a receiver to see that the funds in his hands do not remain unproductive, yet he should make no loans or investments thereof himself, without having first applied to the court and obtained instructions from it.

Where a receiver, without applying for, or obtaining instructions from the

court, placed the funds in his hands with private bankers, without taking any security therefor, and loaned them upon stock collaterals, and was unable to tell to whom the bankers loaned them, or what securities were received, or the amount of interest received, the court charged him with interest at the rate of four per cent upon his monthly balances.

APPEAL by the receiver and by various policyholders from an order of the Special Term passing the accounts of the receiver.

The North America Life Insurance Company was put into the hands of a receiver under the act of 1869, chapter 902, upon the application of the Attorney-General, March 8, 1877. The receiver, Henry R. Pierson, Esq., filed preliminary accounts in April, 1881, which accounts purported to include all transactions of receipts and disbursements down to and including the 31st day of December, 1880. This account claims $1,368,129.16 as the total receipts, and five per cent thereof, to wit, $68,406.44, as the commission due to the receiver to December 31, 1880.

In the course of the examination the receiver admitted that the sum of $3,997.12 was improperly added to the receipts and disbursements, and also the further sum of $2,595.14, being premiums received after the company was enjoined from doing business, and which did not fall due until after the receiver was appointed.

The Special Term still further reduced this sum by the following amounts: $398,028.30, being the amounts of notes and loans on policies and offsets against the face of the policies upon their maturity; $30,176.51, being deductions from death claims or liabilities reduced from their face values by this amount; $22,543.09, being the amount advanced by the receiver for taxes on property sold under the foreclosure of mortgages belonging to the special fund in the hands of the superintendent of insurance, and which was repaid by the superintendent to the receiver.

The receiver appealed from the order of the Special Term deducting these amounts, and also from that part of the order which set aside the letter of the superintendent of insurance of April 3, 1878, fixing the receiver's compensation at five per cent of the assets which might come into his hands, and which also requires the superintendent to fix the per centage anew. The receiver had drawn $33,100, on account of his commissions, out of the fund, and had not charged himself with any interest thereon.

Among the funds which came into the hands of the receiver were some $750,000, paid him by the superintendent of the insurance department, being the proceeds of certain securities placed in the superintendent's hands under chapter 902 of 1869, as collateral security for the payment by the company of its obligations upon a certain class of policies known as registered policies.

It was claimed by some of the appellants that the sum found by the court below, to wit, $910,749.10, as being that upon which the receiver's compensation should be computed, should be further diminished by the amount of the said registered fund; and also that the court erred in directing that the said registered fund should be charged with a *pro rata* amount of the expenses of winding up the company. The registered fund does not cover the admitted claims of the registered policies to a greater extent than about fifty-five per cent.

*R. W. Peckham,* for the receiver.

*W. Barnes, W. D. Whiting, R. J. Moses, Jr., L. McAdam,* for various policyholders.

RUMSEY, J.:

On the 8th day of March, 1877, the North America Life Insurance Company was enjoined from doing business, and Henry R. Pierson was appointed receiver upon the application of the Attorney-General, pursuant to chapter 902, Laws of 1869. In April, 1881, the receiver presented his accounts to the Special Term for examination and approval, and a hearing was had upon the exceptions filed. After considerable evidence had been taken, the court, on the 8th day of September, 1881, made the order which is the subject of this appeal.

The first question argued is whether the receiver should be allowed commissions on the sum of $398,028.30, the amount of notes and loans outstanding on policies at the time of his appointment. It appears that these notes and loans had been made and were outstanding upon the policies in force on the 8th day of March, 1877; that they were considered as offsets to the amount of the face value of the policies; and that the notes and loans were carried on the books of the company, and afterward of the receiver,

only as charges or liens on the policies, and that none of them were collected, but the amount due upon each policy was ascertained by deducting the loans or premium notes standing against it, and the difference was the debt due from the company, on which dividends were computed by the receiver. We think that these notes and loans were not assets on which commissions should be allowed. They constituted neither a receipt nor a disbursement. The receiver collected nothing by reason of their existence; nor did they enlarge either his labor or his liability. As was stated in the opinion of the learned judge at Special Term, " they are offsets; they are not assets." (*People* v. *Security Company*, 78 N. Y., 115, 127.) The case of *Van Buren* v. *Chenango Insurance Co.* (12 Barb., 671) differs from this one. In that case the notes were the capital stock of the company, and were the only reliance for the payment of its debts, and the receiver was allowed his commissions on them for that reason. But that case recognizes the principle that the receiver should have commissions only on his receipts, for the court refused to allow commissions on notes which were not collectible.

The same rule applies to the item of $30,176.51. The receiver ascertained the value of each policy on the 8th day of March, 1877, and if the holder of it died after that date, the premiums and interest he would have been called on to pay to keep it alive were deducted. The total amount of these deductions was the sum of $30,176.51. Nothing was ever received on this item, and it seems to have been simply an entry on the books for the convenience of the receiver or his book-keeper, to enable him to estimate the amount due on such policies.

The item of $22,543.09 was also properly deducted from the amount on which commissions are to be estimated. It seems that the receiver had in his hands a large sum which he had received from the superintendent of insurance. This sum is charged in his receipts as assets. At the same time the superintendent was foreclosing mortgages which constituted a part of this special fund, and upon the property covered by these mortgages there were taxes bearing large interest, which the receiver advanced the money to pay. This advance, amounting to $22,543.09, was repaid to him after the sale of the property, which it seems brought at the sale an enhanced price equal to the taxes paid.

This repayment was not an asset, it was simply replacing in the hands of the receiver a portion of the assets which had for temporary purposes been taken out of the fund. The receiver had the benefit of it as a basis on which to estimate his commissions when he received it in the first place from the superintendent, and if he is allowed to use.it again he gets commissions on it twice and upon so much more than the actual assets received.

We think that commissions are properly chargeable on the amount of the special fund which was paid over by the superintendent to the receiver. The statute directs that the commissions shall be estimated on the amount of the assets of the company which shall come into his possession.

We have no doubt that this special fund is a part of the assets of the company. It is applicable to the payment of its debts, and by the express terms of the statute it is to be paid to the receiver for that purpose. (*Atty.-Genl.* v. *North Am. L. Ins. Co.*, 80 N. Y., 125.) It makes no difference that certain debts are to be first paid out of it. They are equally with non-registered policies. debts of the company. It is true that these securities are to be converted into money by the superintendent and not by the receiver. But aside from this. all the responsibility for this fund while in his hands and all the _abor of its distribution are thrown upon the receiver; and by reason of the existence of this fund the care of the receiver is increased, the expenses are enhanced and, as may be seen from this case, the litigation and delay and trouble is largely caused.

It is not right or proper that all this should be borne by the general fund. It is in the power of the superintendent to fix the commissions with reference to the existence of the two funds and to take into consideration the additional care imposed upon the receiver by reason of this special fund, and to compensate him with reference to this care and to the fact that both funds are chargeable with the burden, and, also, that the expense and responsibility of converting this fund into money ·was borne by the superintendent.

We do not think that the argument is sound that the statute by implication forbids the payment of any of the winding up expenses out of this special fund. The statute says such expenses shall be a charge on the funds of the company. (Sec. 13.) The special deposit is part of the funds. It shares largely in the benefit derived

from the labor of the receiver and his clerks and actuaries and we can see no good reason why it should not contribute to the expense.

We have more difficulty with the interest accounts. The strict duty of the receiver holding these funds for distribution, and not for investment, was to keep them separate from all other moneys so that they could at all times be traced and identified. (*Utica Ins. Co. v. Lynch*, 11 Paige, 520.) He ought not in any way to use the funds unless by direction of the court. It is true that under some circumstances it may be his duty to see that the fund shall not remain unproductive, but when it becomes necessary to invest it he should apply to the court for instructions, and should make no loans or investments without having first obtained such instructions. (Story's Eq., § 833 *a ;* 1 Barb. Ch. Pr. [2d ed.], 674, *et seq. ; Fletcher* v. *Dodd*, 1 Ves. Jr. 85.) If he invests the money he should we think, in the absence of other directions from the court, invest it in government or real estate securities as is the duty of other trustees for investment (*King* v. *Talbot*, 40 N. Y., 76), or in the manner prescribed for insurance companies by statute. (Laws of 1868, chap. 318.) And he should keep clear, accurate and precise accounts, otherwise all presumptions are against him and all obscurities are resolved adversely to him. (Perry on Trusts, § 821; *Bonner* v. *Maybin*, 3 Wood., 724.) These rules are adopted for the protection of the fund and cannot be too strictly enforced.

An examination of the evidence shows that the receiver has not complied with them. He put this fund in the hands of private bankers, without taking from them any security whatever. He loaned it without direction of the court upon stock collaterals of which he was unable at the time of the examination to give any account. Indeed he could not tell to whom the loans were made; nor the amount of them, nor the form of the notes, nor the security taken for each loan, nor in fact that security was always taken. The truth seems to be that all the receiver had to show for this money in the hands of his brokers, was a receipt that they had so much money to loan for him. So far as appears, he kept no account of this fund on any of his books, unless perhaps he had some entries in a pocket account book which he carried with him, but which he did not produce. There is a painful lack of knowledge on the part of the receiver as to the condition of this fund

while it was in the hands of the brokers, and no effort apparently made by him to inform the court of the exact earnings made by it. Indeed the accounts of Chase & Atkins, the brokers, indicate that the loan was to them, and they give no account of separate loans to other persons, nor do they show that any such loans were made. Nor do they account for all the money they had. It appears that on the 28th day of February, 1880, $400,000 was received from the superintendent, and that eight or ten days afterward it was sent to the brokers to be loaned on collaterals. The receiver says he loaned that himself, but he is unable to give the particulars of a solitary loan, or even the name of one person to whom such a loan was made, and that sum does not appear in the account furnished by Chase & Atkins. This all wrong. The receiver had not the powers given by section 12 of the act, for it was not his duty to manage the affairs of the company, but to collect the assets and distribute them as required by section 8.

Even if he had the power to invest, it does not appear that the investments he made were such as the statute requires. (7 Edm. Stat., 307.) It is true that it does not appear that the receiver mingled this money with his own, but there does appear upon his own evidence a carelessness about this large trust fund, and an ignorance of its situation, which ought not to pass without rebuke. The tendency of modern legislation to devolve upon the courts, through receivers, the care of great interests and the custody of vast sums, demands that such trustee be required at all times to comply with the strict rules which experience has shown will alone prevent loss. It is true that in this case there does not appear to have been any fraud or dishonesty on the part of the receiver, nor was the fund lost or diminished in his hands, but that fact does not excuse any breach of trust. (*Utica Ins. Co.* v. *Lynch, supra.*)

As it appears that the receiver actually caused the money to be put to use, and he cannot show what interest he received on it, we might charge him with interest at the rate of six per cent, which is the legal rate. (1 Perry on Trusts, § 468.) But in view of delays likely to occur in making such investments as the court would order, and the probability that they would not earn so much as legal interest, we are not inclined to charge him with it. We think the case will be properly disposed of on this branch of it, by surcharg-

ing the account of the receiver with interest at the rate of four per cent on his monthly balances, as shown by Exhibit 2, since April, 1878, which was the date when he received the first large installment of the special fund, the payment of which he compelled from the superintendent. He is, of course, to have credit on the interest account for the amount actually paid in by him as interest.

As to the commissions of the receiver the order is affirmed. The statute gives to the superintendent the power to fix the commissions to be allowed. We do not think this discretion is unrestrained. The whole proceeding is in court; the receiver is an officer of the court, and the court has general supervision of the distribution of the fund. (*People* v. *Security Life*, 79 N. Y., 267.) If the commissions of the receiver had been fixed by the court, its action would be the subject of appeal. It is a judicial act in a proceeding pending in the court, and we do not see any reason why it may not be reviewed like the act of commissioners to appraise lands, by a motion to vacate or set it aside, or by a motion to review it on the merits like the case of a taxation of costs by the clerk. (*Matter of Canal and Walker Sts.*, 12 N. Y., 406; *Matter of N. Y. C. and H. R. R. R. Co.*, 64 N. Y., 60.) It certainly is not the policy of the law to put such a power in a judicial proceeding in the hands of anyone uncontrolled and unrestrained, and the fact that the matter is pending in court implies that the Special Term has all its powers in dealing with it, among which is the power to control all the proceedings had before it, and to set them aside on sufficient cause shown. (*Matter of R. R. Co.*, 64 N. Y., 60–62; *Matter of Application of Mayor*, 49 N. Y., 150.)

We think the action of the superintendent was properly set aside. It was premature. The compensation should not have been fixed until the superintendent knew with some certainty the labor to be performed, the time necessary to be occupied, and the responsibility to be imposed upon the receiver. (*Gardiner* v. *Tyler*, 4 Abb. Pr. [N. S.], 463; *Grant* v. *Bryant*, 101 Mass., 567–570.) It was *ex parte*. The proper practice in such cases is to require notice of the application, that all parties interested in the fund may be heard. (*Muller* v. *Pondir*, 6 Lans., 474, 482, Learned, J.; Edw. on Recrs., 643–660.) It was based upon a misunderstanding of the

facts. The letter of the receiver states the assets at not over $600,000. As claimed by the receiver now they are more than twice that sum; and as allowed they are over $900,000.

The order of the Special Term must be affirmed, except so much as relates to the interest account. As to that portion the order is reversed and the account of the receiver will be surcharged by computing interest at four per cent on the monthly balances in his hands since April 1, 1878, as shown by Exhibit No. 2, crediting him upon said surcharge with the interest now charged in his account.

No costs of this appeal allowed to any party.

LEARNED, P. J., and OSBORN, J., concurred.

Order of Special Term affirmed, except so much as relates to interest account; as to that portion reversed, and receiver surcharged by computing interest at four per cent on monthly balances in his hands since April 1, 1878, as shown by Exhibit No. 2, crediting him on such surcharge with interest now charged in his account. Order to be settled by RUMSEY, J.